Good morning, your honors. Jan Norman, can you hear me okay? Yes. Jan Norman on behalf of the petitioner appellate Deshon Britt. I'd like to begin by addressing the letter and the citation to Long v. Johnson that was submitted by the my opponent just recently and as he correctly points out this and in the Long v. Johnson case this particular panel affirmed the district court's decision that the Court of Appeals did not was not unreasonable in finding that the evidence was sufficient based upon the deference that is mandated by the by a depa and the and basically the panel found the state's court's decision was not objectively unreasonable. Now from the very beginning appellant has never argued anything else. We have applied the correct standard, we cited it in our opening brief, we talked about objectively unreasonable, but that's where the parallel to John to the Long case stops. In Long, the facts were disputed. The question was did this woman commit the murder or did she not commit the murder. The prosecution presented circumstantial evidence of motive, opportunity, means, the defendant's violent history, lack of defensive wounds on the victim, the failure of the dog to alert to an intruder. I think it would be more helpful to me at least if you talk specifically about this case and whether the evidence that was before this jury permitted a reasonable juror to conclude that your client specifically intended that his gang cohort person kill the rival gang member. If you would talk about that, that would be helpful. Where your client went in to get the shooter and bring him out to the confrontation and so forth, would you talk about why the specific evidence in this case would not permit an inference? Certainly, Your Honor, and I was just trying to use this as a preface to compare the fact that... We remember that, so if you just focus on the facts here, it would be very helpful. My point is in this case, neither the facts nor the law is actually in dispute. We've admitted that Pellant was present. Pellant initiated the first contact with the victim, said, where are you from? Then he goes, the appellant goes in and may or may not have been aware that Jones, the co-defendant, had a gun. But for the sake of argument, let's assume he was aware that Jones had a gun. So my client goes in, he gets Jones, they leave the liquor store together, Jones walks up to the... The Jones and the victim then start fighting. The victim then gets the better part of Jones, hits him in the face, knocks him to the ground. At this point, Jones whips out his gun... Can I stop you there? Because I want to make sure I've got the facts right. Ms. Avalos... Correct. I don't know her first name, Desiree or something like that? It's either Desiree or Desiree, yes. But I mean, reading her testimony seemed to me to be a lot more damaging for your client than the summary you just gave. Because am I wrong in remembering that she testified not only that your client was the one who initiated the contact with Patterson, was that the victim's name? Yes. But that when Patterson came over or no, I'm sorry, that when your client went in, got Jones and they came back out, that your client was the one who sort of signaled to get Patterson to come over. And that when Patterson did come over, he was, your client was involved in the verbal altercation as well. And that after Jones got knocked down, your client and Patterson got into it and your client got knocked down as well before Jones ever fired at him. So that's the factual narrative that I'm remembering. And to me, that is, that certainly is enough from which a reasonable jury could infer that your client and Jones had a plan to, to attack the victim. Your Honor, I don't disagree with you that there may have been a plan to assault the victim. We're not talking about a conviction for assault. What we're talking about here is a conviction of first degree murder under an aid or in a better theory, which requires my client to have formed the intent to kill the victim when he, and to carry out that plan. He went in, he got Jones, he brought Jones out, they got into a confrontation. The problem here is where do we, where do we find that Jones formed a specific intent to kill the victim? And without Jones' specific intent to kill the victim, how can we find that my client, Mr. Britt, formed an intention to kill the victim? What we have here is an intention to, at best, assault the victim. Engage the victim in a verbal and physical altercation. We do not have a specific intent to murder. Does it make any difference that in the recorded conversation that Jones, the Jones conversation at one point during that long rant, he says, talking about the detective, they knew, they knew we banged on the nigga. Pardon my statement, but I'm quoting here. And so he's also referring to it as a mutual thing because he's talked about being with your client. So does that also support an inference that he was part and parcel of the event? There is no doubt that my client was part and parcel of the event. The fact that, that the co-defendant says they banged on the victim. No, there's no testimony that banged on means I murdered the victim. We intended to murder the victim. Beat up the victim. Engaged in an altercation with the victim. Yes. And he's also talking in the, in the past tense, we banged on the victim. In other words, we hit the victim. So, so in order to make that evidence of a specific intent to murder, you would have to be interpreted that after the fact, Jones was saying, my client and he intended to kill the victim. Well, what we're really reviewing here is the state court's opinion. And whether it's an unreasonable application of Jackson. And there's a fairly significant discussion of specific intent. And what evidence there was in the record that would allow an inference that Britt shared the same intent as Jones. And one could agree with this or not. But the question for us is, is that discussion unreasonable? And if so, in what particulars? It's on page four of the slip opinion and page 37 of the excerpts. Correct. Well, one, he initiated the contact. Okay, that's indicative maybe that he intended to have a confrontation with the victim. That he, my client, intended that he and Jones would have a confrontation. That's not evidence that Jones intended to murder, let alone that my client shared the intent of Jones. Two, he enlisted the aid, same argument. Three, the appellant was not or displeased when Jones tried to shoot the victim. The fact that he wasn't surprised or displeased does not prove- Well, you're missing a beat there because what the state court says right in between those two things is that the gun jammed and Jones tried again. And so at that point, because pre-penetration doesn't have to be lengthy. And the aider and abettor's intent doesn't have to be lengthy either. Once Jones pulled out his weapon and it jammed and he went to try again, that's a sufficient time as I understand California law for there to be the specific intent to go ahead and let's complete this. And I guess, I might not have reached this result, but I'm having a hard time seeing why it's unreasonable. Well, I'm almost out of time, Your Honor, but I would like to answer that question if I could be allowed a minute. Yes, answer it regardless, but yes, we'll give you some time. Your Honor, assuming that we don't say that the evidence of what occurred up to that point was an intent to commit murder. We say that Jones formed the intent to commit murder when he pulled out a gun, and the gun, and he shot, and then there was like, okay. My client realizes, he intends to murder him, I agree, and there's whatever it is, two seconds, five seconds, I believe, the record, and he shoots again. What is it that my client is doing in that five seconds that's aiding and abetting the decision that's been made? Take that out of context. It's in the context of him having retrieved this guy from inside. In the first place, there's a gang confrontation. He goes and gets his buddy to come out. He's watching this big fight. I mean, you do take it in context, but it's clear that it isn't instantaneous. It isn't like the gun comes out and it's all over. There is time. And I guess the question for us is whether those inferences are unreasonable. Can I just ask one question before you sit down? Just, you've been focusing on the notion that the intent to kill could not have been formed either with respect to Jones or with respect to your client until like literally the moment before the shots were fired. Why couldn't the jury reasonably infer here that when your client went back in, sorry, when your client went back into the liquor store to get Jones, that your client knew that Jones was armed. That was the purpose of him retrieving Jones to help. And that the two of them, by virtue of their status in a rival gang and this victim was in their territory, that they had an understanding as the moment they walked back out, we are gonna confront this guy and you know what we're gonna have to do if need be. So that the intent to kill was formed when your client went back in to get Jones with the purpose of getting an armed cohort to go confront a rival gang member. And according to the expert testimony we had from the officer, you know, as soon as he said whatever, I can't remember what the name of the gang was. But saying that in their territory was basically it's on. Why couldn't the jury have reasonably inferred that the intent to kill on both men's parts was formed then and that when they went back out, that's what followed? Because there is no evidence of the fact that they intended to kill. I think it's objectively unreasonable to assume, to conjecture, to assume, to speculate, to find that they formed a specific intent to kill at that point. They formed the intent to confront them, yes. Did they inform the intent? I think the evidence is clear. In fact, the jury found the other guy was guilty of second degree murder, but let's, but, which is irrelevant. But they found, They left the store with the intent to confront the guy. And kill him if necessary. Where is the evidence that they were going to kill him if necessary? The fact that the guy was armed? I mean, if they were going to just go out and kill him, why didn't they just go shoot him? And they'd already offended him. He'd already said. I agree, right. Why didn't Jones just, as soon as they walked out and Patterson came up, why didn't he just fire then? Why did he even get involved in the fight? And why did they get into a verbal altercation? I mean, if he was going to shoot him, why did he get in a verbal altercation? And if he was going to shoot him because a guy offended him, why didn't he pull the gun out then and shoot it? I mean, the point is he does not pull out the weapon until he's knocked flat on his, you know what, on the ground. He's losing the fight. Then he pulls the gun out and maybe in that five seconds in between pulling, the first shot doesn't go off and the second shot goes off. Jones has formed a specific intent to kill the guy. And so he's going to shoot him in the head. But where is my guy aiding and abetting that ten second decision? He's standing there. He's not doing anything else. I think we understand your position. You are well over your time, but we will allow you a minute to rebuttal. Thank you. May I please have the court deputy attorney general Michael Katz for responding. Can you remind me, so which theory did the state choose at trial to pursue? The theory that the specific intent to kill was formed just like literally moments before the shots were fired or was the intent formed when they went back into the liquor store? My understanding, your honor, is that it was, I could be wrong about this, but I believe what the state decided at trial was to pursue the theory that it was before Jones came out of the liquor store. Now regardless of what the state decided, of course the reason, the issue is whether a reasonable juror could rely on that theory. And I don't, I'm not seeing, I tend to agree with your opponent that I don't see how a reasonable jury could infer that Brit, forget about Jones. I mean, Jones, I don't know what his fate ended up being, but in terms of Brit, if Brit's intent when he went back in to get Jones was merely to confront the guy, right, get into a verbal altercation, maybe exchange some fisticuffs, I think is one lawyer put it in cross-examining the witness. If that was Brit's intent in going into the store, I don't think there was anything he did to aid and abet in that couple of seconds, a moment between the time that Jones pulled out the gun unexpectedly and fired it, he didn't do anything to aid and abet that. So I actually think that theory, if that's the theory that you're saying we should affirm on, I would not be prepared to do that at all. That's why I was curious, did the state even pursue the alternative theory that I put forward, because that's the only one that I could think of that might even remotely be reasonable here. Your honor, I actually don't remember which theory it was. But what I would say is it doesn't matter which theory the state pursued. It matters whether any reasonable juror could pursue either theory. Well, it's not even that. It's whether the state court of appeals opinion concerning this issue was unreasonable. Yes, of course, your honor. Thank you for reminding me. And I didn't want to repeat it because I wanted to be concise. But with the double deference standard, that's the issue. And so- Why was it reasonable, just take the first theory then. Why was it reasonable for the jury to draw those inferences? From the theory that it started when he went out of the liquor store? That's the only one I can think of that's reasonable. So you're, and Judge Graber's absolutely right. We, if that's what's supported, we gotta go with that. So let's hear why that's reasonable. Yes, your honor. Well, first of all, my opponent suggested that Jones did it just spontaneously while he was losing the fight. But of course, that's, the jury could have decided otherwise. The jury could have decided that Jones knew when he came out of the liquor store that he was going to kill the victim. And of course, it doesn't matter what, it's certainly- He just, I mean, the testimony as I remember is that Jones is kind of on the smaller side. I don't know how big Patterson was. But your theory is that Jones walked out of the liquor store and said, I'm going to kill this guy, right? Yes, that's my theory. But let me get into a fight where I'm going to get knocked to the ground first and then kill him. Why wouldn't he just take out the gun, as your opponent suggested, and just shoot him right when Patterson walked up? That would make a lot more sense, wouldn't it? It would make sense if you were a completely logical murderer. But we know that criminals don't always act in a perfectly logical order. They do all kinds of things before they actually do the fatal act. And it's not my burden to prove that Mr. Jones or Mr. Britt acted completely logically like a Ninth Circuit judge might. This is a double deference case. And it is certainly a reasonable inference that a juror could make. And it's reasonable for a state appellate court to find that a reasonable juror could make that inference based on the fact that the defendants were gang members. They hung out together at that store frequently, as the store proprietor said. In addition to all the facts that the court recited during appellant's argument accurately, when this petitioner was talking on the phone to his cousin and had no motive to make false statements that would implicate himself, he was saying, essentially agreeing, I should have changed my clothes. And they got me. Jones was the shooter. Now, if you were completely innocent, would you say that to your relative? Because you heard your opponent say, he's not saying I'm completely innocent. He knows he was involved in an altercation with a guy who ended up dead. I mean, that's obviously not a good place to be in. I think even if you or I were in his shoes, we'd be upset that we hadn't changed our clothes and had managed to get caught. Because totally apart from whether he had formed any intent on his own part to have Patterson killed, he was involved in an assault on the guy that wound up with him, the guy being dead. So that's just, I don't think you can read anything into what he said in that taped call. Well, if I may, Judge Watford, if you or I were in that situation, we would know that we were in jail after somebody died. And we would know, even if we didn't read California law, we could figure out, you asked, why didn't they behave logically? So sometimes even a stupid person can realize that they're facing a homicide charge. Because the other guy died. It wasn't that they knocked him to the ground and he got up. But I don't think you were the author of the brief, necessarily. I was not. Yeah. But the brief we got suggested, oh, well, a jury could have inferred from the lack of remorse, or I think that's how it was put. Somehow that because he was complaining that he had gotten caught, clearly that shows that he must have intended that Patterson died. And I think that's totally illogical. It's not, that's not reasonable. And if that's the argument you're making, that's what I was trying to figure out. Why are you bringing up this tape recorded call? Because it doesn't suggest to me anything that you could infer about Britt's intent with respect to Patterson being murdered. Well, I respectfully suggest that it's not just that he doesn't express regret, but he doesn't express regret during a homicide investigation, not during an assault investigation. And you would think if you were talking to your relative after the victim died and you were on the phone from jail, imagine what that might be like. You didn't know that your fellow gang member was going to kill the guy and now you're sitting in jail. You would be pretty scared and you would be determined to explain to somebody you thought was sympathetic to you. Look, I had no idea that Jones was going to kill this guy. And now look at me, I'm in jail for a homicide. He didn't say any of that. So we didn't express regret during a homicide investigation. That is a significant factor, Your Honor. And of course, it's not in isolation. It's in addition to everything else you recited and Judge Graber recited, and it's with a double-deference standard. So it's not our burden to prove to you that a single fact was sufficient in isolation to withstand the double-deference standard. It's all the facts in combination. Well, does it make any difference as I understood the facts, at least as recited by the California Court of Appeal, in addition to knocking Jones down, Patterson had also knocked this defendant down onto the ground as well. Is that right or wrong? I don't remember whether that's right or wrong. I do know that this defendant wasn't... It may bear on his state of mind because if he was also gotten the better of during the fight, then it might be more reasonable to consider that he, at that point, shared the intent to take the guy down. I would say this, Judge Graber. I know that this petitioner was involved in the physical fight. Whether he was knocked to the ground or not, I don't remember. And it certainly is... California Court of Appeal said so. That's what Avalos testified. Thank you. But I would say this. It's certainly a potential motive if you're losing the fight to get angrier, but it's not like gang members say, okay, I won this physical fight, so the fight's over. It's something that happens all the time. Can it happen? Sure. Does it always work out that way? I think we know as a matter of common sense, it doesn't always work out that way with gang members. You could get into a traffic dispute and be shot, even if you say, I'm sorry. So again, with a double deference standard, I would submit it buttresses the case, but it doesn't matter whether this petitioner was losing the fight. He was in a physical fight. Excuse me. Physical fight, and given all the other evidence we discussed, it survives a double deference standard. I see I have 121 remaining. Unless the court has any other questions, I'll submit the matter. Are you the one who submitted the 28J letter? I am. It was kind of insulting. It was insulting? I thought it was insulting, yeah. The case decided two years before the state submitted its brief. Do you think we don't remember the cases we're involved in? It has nothing to do with this case whatsoever. Well, it's a double deference standard, Your Honor. Yeah, we remember the cases we're on. It's not new authority. I guess you did a search after you found out the panel's identity, which is good lawyering on your part. Somebody else actually found the case, I have to admit. There's nothing wrong with it. I'm just letting you know. I just found that insulting. I didn't mean to offend you, Your Honor. I'm sorry.  It covers any authority that's not in the brief. No, no. I think it does, Your Honor, because we read it yesterday. Well, if I may just bring us to a close. We don't have to decide in this case how to read 28J, which is good. But at all events, I don't believe we have any more questions for you. I'll just say for the record that my understanding of 28J is authority that has come to the attention after the brief's been filed. Maybe I'm wrong on that. I agree with that, Your Honor, and it did come to my attention after the brief was filed. I didn't write the brief, and it came to my attention after the brief was filed. It came to my attention last week when somebody else pointed it out to me. I did not mean to offend the court. It's only relevant because of who the panel turned out to be. What a coincidence that all three of us were on that case. But I'm just saying that you're the state's brief, rather. I know it wasn't you who filed the brief. The brief was filed this year, earlier this year, in 2015. That case was decided in 2013, if I remember. If it had been so relevant to the legal issues in the case, it would have been cited in the brief. I'm just saying you find a case that happens to involve the panel members, you throw it at us like we don't remember the cases we're involved in. I just found that insulting. That's all I'm saying. It's nothing improper. It's just insulting. I apologize for insulting you. That was not my intention. We appreciate that. Thank you. And Ms. Norman will give you a minute for rebuttal. I think you've probably heard this enough, but I just do want to point out that the issue of whether or not the appellant expressed remorse in his conversations with his family was one of the reasons that was cited by the Court of Appeals and by the District Court, and I believe is objectively unreasonable. And the other one was that he did not express surprise or displeasure at the fact that Jones had been killed. Again, I think that is objectively unreasonable. Consider that a valid evidence in assessing the sufficiency of the evidence. Thank you, counsel. The case just argued is submitted, and we appreciate both counsel's arguments.
judges: Graber, Rawlinson, Watford